AO 106 (Rev. 06/09) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Missouri

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| | ) | |
| Subject Electronic Device: A Blue Apple iPhone with no case; Model # Unknown; FCC ID: Unknown; IC: Unknown; IMEI: Unknown; located at the St. Louis Gateway Strike Force, photographed and attached in Attachment A. | ) ) ) ) ) | Case No.    4:26 MJ 9018 RHH <br><br> SIGNED AND SUBMITTED TO THE COURT FOR FILINGBY RELIABLE ELECTRONIC MEANS |

## APPLICATION FOR A SEARCH WARRANT

I, _Jaclyn Casaceli_____, a federal law enforcement officer or an attorney for the government request a search warrant and state under penalty of perjury that I have reason to believe that on the following property:

Subject Electronic Device: A Blue Apple iPhone with no case; Model # Unknown; FCC ID: Unknown; IC: Unknown; IMEI: Unknown; located at the St. Louis Gateway Strike Force, photographed and attached in Attachment A.

located in the ____EASTERN____ District of ____MISSOURI____, there is now concealed

### SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| Title 21, U.S.C. 841, 846 | conspiracy to distribute and possession with the intent to distribute controlled substances; money laundering |
| Title 18, U.S.C. 1956 | |

The application is based on these facts:

### SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

I state under penalty of perjury that the foregoing is true and correct.

_____
*Applicant's signature*

Jaclyn Casaceli, Special Agent, DEA
_____
*Printed name and title*

Sworn, to, attested to, and affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedure 4.1 and 41.

Date: ____1/14/2026____

_____
*Judge's signature*

City and state: St. Louis, MO

Honorable Rodney H. Holmes, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: John Mantovani

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF **Subject Electronic Device:** A Blue Apple iPhone with no case; Model # Unknown; FCC ID: Unknown; IC: Unknown; IMEI: Unknown; located at the St. Louis Gateway Strike Force, photographed and attached in Attachment A. | No. 4:26 MJ 9018 RHH **FILED UNDER SEAL** SIGNED AND SUBMITTED TO THE COURT FOR FILING BY RELIABLE ELECTRONIC MEANS |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A SEARCH WARRANT

I, Jaclyn Casaceli, being first duly sworn by reliable electronic means, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property – one electronic device – described in Attachment A, which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a Special Agent (SA) with the Drug Enforcement Administration (DEA), United States Department of Justice, and I am currently assigned to the St. Louis Division Office (SLDO). I have been employed by the DEA since June 2018, during which time I have specialized in investigations involving narcotics trafficking. Prior to my assignment with the DEA, I was a Police Officer with the Cranston, Rhode Island Police Department for approximately two years and a Police Officer with the Middletown, Rhode Island Police Department for approximately three years. Upon joining the DEA, I completed 16 weeks of training in drug investigations and related legal matters at the DEA's Training Academy in Quantico, Virginia. Coursework at the

Training Academy included Drug Identification, Undercover Techniques, Tactical Training, Interview and Interrogation Techniques, and Legal Instruction. Since then, I have received additional training in Cyber Investigations, Cryptocurrency tracing and Undercover Techniques. While at the DEA, I have also personally participated in multiple narcotics investigations.

3.      Through my training and experience, I am familiar with the way in which narcotic traffickers conduct their business, including, but not limited to: the types and amounts of drugs distributed; the types and amounts of profits made; the methods of importing and distributing controlled substances; the use of mobile telephones, email accounts, and the Internet to facilitate their transactions; and the use of numerical codes and code words to conduct their dealings. I have participated in investigations that have led to the issuance of search warrants involving violations of narcotic laws. These warrants involved the search of locations including: residences of targets, their associates and relatives, "stash houses" (houses used as drug/money storage locations), storage facilities, cellular/camera phones, and computers. Evidence, searched for, and recovered in these locations has included controlled substances, records pertaining to the expenditures and profits realized there from, monetary instruments and various assets that were purchased with the proceeds of the drug trafficking. I have participated in the execution of multiple federal search warrants.

4.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

2

5.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Section 1956 and Title 21, United States Code, Sections 841(a) and 846 have been committed by **Christile HUGHES-DILLON** and other persons known and unknown. There is also probable cause to search the information described in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

## LOCATION TO BE SEARCHED AND IDENTIFICATION OF THE DEVICE

6.      The information contained in this Affidavit is submitted for the sole purpose of demonstrating probable cause exists to search the following electronic device, described below and depicted in Attachment A:

   a. **Subject electronic device:**    Blue Apple iPhone with no case; Model # Unknown; FCC ID: Unknown; IC: Unknown; IMEI: Unknown; photographed and attached in Attachment A.

7.      Following their seizure, as described below, the **subject electronic device** was transported to and stored securely in the St. Louis Gateway Strike Force electronic evidence lockers located within the city of Maryland Heights, in the Eastern District of Missouri. They have not been examined or altered in any way since its seizure.

8.      The applied-for warrant would authorize the forensic examination of the **subject electronic device** for the purpose of identifying electronically stored data particularly described in Attachment B.

3

## TECHNICAL TERMS

9. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include

4

various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna

5

receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication Devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for

6

example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g.  Pager: A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

h.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i.  Internet: The internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the internet, connections between devices on the internet often cross state and international borders, even when the devices communicating with each other are in the same state.

10.    Based on my training, experience, and research, I know that the **subject electronic device** has capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data

7

stored on these types of devices can uncover, among other things, evidence that reveals or suggests who possessed or used the **subject electronic device**.

## INVESTIGATION AND PROBABLE CAUSE

### A.    Background of Investigation

11.    The United States, including the DEA, is conducting a criminal investigation of **Christile HUGHES-DILLON** aka: **"Puff"** (HUGHES-DILLON) and others known and unknown regarding the commission of the subject offenses. Presently, as described below, **HUGHES-DILLON**, Oscha DILLON aka: "O" (DILLON), Brandon JIMMERSON (JIMMERSON), Shawn RHODES aka: "JR" (RHODES) and Steffon RAINES (RAINES) are conspiring and working together to acquire and distribute fentanyl, marijuana and other controlled substances for distribution throughout the St. Louis area for a drug trafficking organization (DTO.)

12.    During the course of the investigation, DEA, including myself, have obtained evidence of the drug conspiracy through the use of confidential sources (CS-1 and CS-2), surveillance, controlled drug purchases, recorded telephone communications, Title III wire intercepts, toll analysis and debriefings.[1]

13.    In March 2025, DEA St. Louis investigators learned of a substantial St. Louis-based fentanyl distributor, later identified as DILLON. According to CS-1, DILLON acquires substantial amounts of fentanyl and redistributes the fentanyl to smaller drug factions, such as **Christile**

---

[1]    DEA investigators established a Confidential Source ("CS-1") relative to a separate but on-going DEA investigation. CS-1 began cooperating with investigators during the separate investigation in early March 2025. CS-1 has prior felony convictions for drug offenses and is cooperating for judicial consideration. The information provided by CS-1 has been corroborated by recorded surveillance, pen register information, telephone toll analysis, and recorded telephone conversations. To date, CS-1's information has not been found to be false or misleading.

8

**HUGHES-DILLON DTO** within the Eastern District of Missouri.[2] CS-1 revealed in recent past, he/she would typically acquire multiple ounces of fentanyl at any given time from DILLON. At times, DILLON has directed CS-1 to contact JIMMERSON for the purchase of fentanyl when DILLON has been outside the St Louis area, leading investigators and me to believe JIMMERSON is acting as a fentanyl distributor for the DILLON DTO.[3] Investigators and I have also identified **HUGHES-DILLON,** and since his March 2025 release from prison on conspiracy to distribute cocaine base charges, **HUGHES-DILLON** has since been recruited as a distributor and suspected stash house operator for the DILLON DTO.[4] Furthermore, investigators and I have observed **HUGHES-DILLON** transport suspected drugs to JIMMERSON. As set forth herein, law enforcement believes evidence, fruits, and instrumentalities of violations of the Subject Offenses will be found on the **subject electronic device**.

### B.    Initial Surveillance of HUGHES-DILLON

14.    On May 7, 2025, investigators, including myself directed CS-1 to travel to 6419 Wellsmar Ave, St Louis, Missouri to make contact with JIMMERSON, who during spot-

---

[2]    As a result of past DEA investigations, along with the current investigation, I am aware that DILLON is the older cousin to **HUGHES-DILLON**. Specifically, **HUGHES-DILLON's** mother, Alicia DILLON is the sister to DILLON's father, Oscar DILLON II.

[3]    Through wire intercepts, GPS coordinates, and surveillance, investigators and I learned that DILLON had moved away from St. Louis, Missouri to Katy, Texas.

[4]    In *United States v. Christlie Hughes-Dillon et al*, (4:21-CR-563 MTS), on September 12, 2023, following a plea of guilty to Count 1 (conspiracy to distribute and possess with intent to distribute 28 grams or more of cocaine base), the defendant was sentenced to 65 months' imprisonment, to be followed by four (4) years of supervised release. On January 17, 2025, the President of the United States granted clemency to the defendant (along with approximately 2,500 other federal criminal defendants) and set his sentence of imprisonment to expire on February 17, 2025. On March 7, 2025, the defendant's four-year term of supervised release began. Based in part of **HUGHES-DILLON's** criminal activity detailed in this affidavit, the United States Probation Office has filed a petition for the revocation of the **HUGHES-DILLON's** term of supervised release. That case is presently pending, and the defendant has been ordered detained in that case.

9

surveillance, was observed outside the residence. At approximately 1:20pm, I observed CS-1 arrive and park in the area of 6419 Wellsmar Ave. CS-1 was observed exiting their vehicle and approaching JIMMERSON who was standing just outside the passenger side of a black Dodge Challenger. CS-1 began conversing with JIMMERSON and several other individuals who were located outside the residence.

15.    At approximately 1:40pm, I observed a black Dodge Journey, bearing Illinois License CA62737, arrive and park on the street near 6419 Wellsmar Avenue. Soon after, a black male, who I immediately recognized as **HUGHES-DILLON**, exited the vehicle carrying a backpack (dark in color), which appeared to be containing something of weight and approached the group of individuals, including CS-1, outside 6419 Wellsmar Avenue. Shortly after, **HUGHES-DILLON** entered the residence, still carrying the backpack, followed by JIMMERSON.

16.    At approximately 1:45pm, I observed JIMMERSON exited the residence, followed by **HUGHES-DILLON** approximately one minute later. **HUGHES-DILLON** was still in possession of the backpack. However; the backpack appeared to no longer contain anything of weight. This led investigators and me to believe whatever **HUGHES-DILLON** concealed within the backpack which was brought into the residence was left behind as **HUGHES-DILLON** departed the residence. Moments later, I observed **HUGHES-DILLON** reenter the Dodge Journey and depart from the area.

17.    At approximately 2:03pm, I followed the CS-1 as he/she returned to his/her vehicle and departed the area, traveling to the predetermined meeting location. Once at the predetermined meeting location, CS-1 provided me with a small brown baggie containing a "free sample" of

10

suspected fentanyl.[5] CS-1 explained to me that while at the residence, JIMMERSON provided him with the suspected fentanyl sample. CS-1 further advised that after some time, a male CS-1 later identified as **HUGHES-DILLON** through his driver's license photograph, arrived driving a black Dodge Journey. **HUGHES-DILLON** retrieved a backpack from the vehicle and shortly after, entered the target residence with the backpack. CS-1 stated the backpack initially contained approximately two (2) kilograms of fentanyl, which he/she observed.

18.     On September 25, 2025, investigators, including myself initiated surveillance in the area of 3031 Wintergreen, Florissant, Missouri, a residence associated to Alicia DILLON and her son, **HUGHES-DILLON** (the Wintergreen Residence.)   Additionally, investigators obtained recent information through the DEA Tip Line advising **HUGHES-DILLON** was distributing fentanyl and marijuana, along with storing illegal firearms within the residence.

19.     At approximately 11:00am, TFO Gaddy observed a gray Alfa Romeo Stelvio SUV bearing Missouri license plate TL3-C2S (Alfa Romeo SUV) parked in the driveway of the Wintergreen Residence. Approximately one hour later, TFO Gaddy observed **HUGHES-DILLON** exit the Wintergreen Residence and approach the Alfa Romeo SUV, entering the front driver's door. **HUGHES-DILLON** drove away.

20.     **HUGHES-DILLON** travelled to the area of the Ross Dress for Less at or near 13995 New Halls Ferry Road, Florissant, Missouri. At that time, TFO Gaddy observed **HUGHES-DILLON** circling the parking lot eventually pulling up directly next to a green in color Toyota,

---

[5]     The substance appeared to be, in my training and experience, fentanyl based on its color and physical characteristics. The suspected fentanyl was transferred to the DEA South Central Laboratory for analysis.

bearing partial Illinois license plate Y91. The green Toyota was occupied by two white females. Immediately, TFO Gaddy observed **HUGHES-DILLON** and the white female driver of the green Toyota simultaneously reach their arms out the driver's side windows of their respective vehicles and appeared to conduct a quick hand-to-hand transaction, indicative of a street level drug sale. Seconds later, the subject vehicle and the green Toyota exited the parking lot, traveling in different directions.

21.     In September 2025, investigators and I conducted a debrief of a confidential source (CS-2).[6] During the debrief, CS-2 provided information regarding the habits concerning the drug trafficking activities of **HUGHES-DILLON** and others. That information included but was not limited to several locations **HUGHES-DILLON** and his DTO commonly frequent to store, maintain, process and distribute large quantities of fentanyl and marijuana. CS-2 advised that he/she has observed **HUGHES-DILLON** use cellular devices on numerous occasions to coordinate the distribution of drugs.

22.     CS-2 was asked if he/she was capable of acquiring and/or purchasing drugs directly from **HUGHES-DILLON** or others within his DTO. CS-2 was adamant he/she would be unable as CS-2's role within the DTO does not involve the distribution of drugs and would greatly raise suspicion of their cooperation with law enforcement if CS-2 would inquire about procuring drugs. CS-2 expressed his/her concern of **HUGHES-DILLON** violent tendencies, and CS-2's direct

---

[6]     In September 2025, DEA investigators established a Confidential Source ("CS-2") who provided information regarding drug trafficking organizations operating out of the greater St Louis area. CS-2 has prior misdemeanor convictions for assault and property crimes and is cooperating for financial incentives. The information provided by CS-2 has been corroborated by surveillance, telephone toll analysis and investigators prior knowledge of target subjects. To date, CS-2's information has not been found to be false or misleading.

12

knowledge of **HUGHES-DILLON's** past violent acts and that **HUGHES-DILLON** carries a firearm at all times.

### C. Continued Surveillance of HUGHES-DILLON and Execution of a Search Warrant at the Wintergreen Residence.

23. On October 1, 2025, during covert surveillance, investigators followed the defendant in the Alfa Romeo SUV as he left the Wintergreen Residence and drove to a park in Berkeley, Missouri. There, we observed the defendant pull alongside a Chevrolet pickup truck. The defendant and the driver of the pickup then conducted a quick hand-to-hand transaction through the drivers' windows of the vehicles. Immediately after the brief interaction, the defendant sped away. Based on their training and experience, we recognized this interaction as a drug transaction.

24. On October 20, 2025, investigators conducted a "trash pull" from the Wintergreen Residence. In the trash, investigators found and seized torn-off corners of plastic baggies containing an off-white powdery residue. Field testing of the residue returned positive for fentanyl.

25. On October 22, 2025, investigators executed a federally authorized search warrant at the Wintergreen Residence.[7] In the defendant's bedroom, investigators located and seized 5.7x28mm ammunition, a 5.7x28mm submachine gun magazine, seven additional pistol magazines, a large amount of U.S. currency, two digital scales that appeared to be used to weigh controlled substances, and numerous court documents bearing the defendant's name.

---

[7] On October 21, 2025, United States Magistrate Court Judge Joseph S. Dueker, Eastern District of Missouri authorized the search warrant for 3031 Wintergreen Drive, Florissant, Missouri (Cause No. 2:25-MJ-2339 JSD).

13

Case: 4:26-mj-09018-RHH    Doc. #: 1    Filed: 01/14/26    Page: 15 of 29 PageID #: 56

## D.    Evidence Located on HUGHES-DILLONS Instagram Account

26.    Throughout the course of the instant investigation, investigators have closely monitored the Instagram and social media pages of multiple members of the DTO and observed an Instagram profile under the name "paperchaser2z" (**HUGHES-DILLON's** Instagram account) that frequently posted photos of **HUGHES-DILLON**. In particular, the profile picture attached to the **HUGHES-DILLON's** Instagram account is a photograph of **HUGHES-DILLON** fanning out a large quantity of United States currency (USC).[8]

27.    While reviewing the content and posted communications within the **HUGHES-DILLON's** Instagram account, TFO James Gaddy was able to establish that **HUGHES-DILLON** was the holder and user of that account. For example, TFO Gaddy initially focused on the subject account's Instagram post and observed several photographs depicting **HUGHES-DILLON**.[9] However, on September 25, 2025, shortly after losing sight of **HUGHES-DILLON** after he met with the two white females, detailed above, TFO Gaddy noticed that **HUGHES-DILLON** had posted an Instagram post with a series of photographs, two of which are depicted below.

---

[8]    I am aware that social media and/or application messaging platforms such as Instagram, Facebook Messenger, WhatsApp, etc., allow their users to communicate back and forth in real-time with other users. From my training and experience, I know that criminals who use these applications believe these applications are less likely to be monitored by law enforcement then traditional cellular voice communications.

[9]    An Instagram post is a photo or video that a user shares on their profile and appears in their followers' feeds and on their profile grid. These posts can include single images, multi-image carousels, or videos, and can be accompanied by a caption.



28.    The far-left post appears to be a photo taken by unknown person of **HUGHES-DILLON** posing in the street in front of an unknown residence. Furthermore, the clothing **HUGHES-DILLON** is wearing in the photo is the same clothing that TFO Gaddy observed **HUGHES-DILLON** wearing as he departed the Wintergreen Residence, prior to meeting with the two white females on September 25, 2025. The far-right post is several bundles of cash laid out on a red front passenger seat. It should be noted, through my own surveillance, along with open-source intelligence, I know the Alfa Romeo SUV **HUGHES-DILLON** used on September 25, 2025, to depart the Wintergreen Residence is equipped with red interior upholstery. Additionally, during the execution of a federal search warrant for the Wintergreen Residence on October 22,

15

2025 described above, TFO Stephen Hill conducted a search of the vehicle and noted that the upholstery and seats were red in color and matched that of the photograph.[10]

29.    On October 15, 2025, a series of photos were "posted" **HUGHES-DILLON's** Instagram account. Two of those photos are depicted below.



30.    The far-left post appears to be a photo taken by **HUGHES-DILLON** as a "selfie" posing holding one large bundle of USC, broken down in smaller increments by black rubber bands. It appeared by the photo, that **HUGHES-DILLON** is laying on a bed, consisting of gray bedding. The far-right post appears to be a photo of several bundles of cash situated over a bed

---

[10]    On October 21, 2025, United States Magistrate Court Judge Joseph S. Dueker, Eastern District of Missouri authorized the search warrant for 3031 Wintergreen Drive, Florissant, Missouri, associated to Christile HUGHES-DILLON (Cause No. 2:25-MJ-2339 JSD).

16

consisting of gray bedding with the death notice of **HUGHES-DILLON's** younger brother, who was murdered in St. Louis County, Missouri. During the execution of the search warrant for the Wintergreen Residence on October 22, 2025 as described above, TFO Gaddy observed sheets matching the ones in the picture on **HUGHES-DILLON's** bed in his bedroom along with the death notice of **HUGHES-DILLON's** younger brother.

31.     Continuing, TFO Gaddy used his undercover Instagram profile and began to "follow" **HUGHES-DILLON's** Instagram profile. This allowed TFO Gaddy to monitor **HUGHES-DILLON's** Instagram "Stories."[11]

32.     On October 16, 2025, TFO Gaddy observed a series of "Stories" from **HUGHES-DILLON's** Instagram account. The "Stories" consisted of multiple videos lasting approximately 10 seconds in duration. Each video showed what I believed to be different "types" (or strains) of marijuana with a dollar sign ("$") illustrated on the video. Additionally, a few of the videos listed what I believed to be the name of the high-grade marijuana (in the top right corner of each screenshot) and at the bottom a listed price "950" per pound. The below depicted screenshots of the videos TFO Gaddy collected and preserved.

---

[11]     An Instagram story is a photo or video that disappears after 24 hours unless you save it to your profile as a "Story Highlight." They are a more casual way to share behind-the-scenes or in-the-moment content.

17



33.    Investigators believe additional photos depicting evidence of the subject offenses, along with the photographs investigators captured from **HUGHES-DILLON's** Instagram account will be located on the **subject electronic device**.

### E.    Arrest of HUGHES-DILLON and Seizure of the Subject Electronic Device

34.    On January 7, 2026, United States Marshal Service (USMS) deputies, with the assistance of St Louis DEA investigators, arrested **HUGHES-DILLON** for an active federal arrest warrant out of the Eastern District of Missouri for his violation of the conditions of his federal supervised release discussed above. That morning, investigators responded to 9920 Northgate Drive, St Louis, Missouri in an attempt to located **HUGHES-DILLON**. After USMS deputies began a knock and announce, Ja'Meshay McConnell followed by **HUGHES-DILLON** responded to the front door from within the residence. Once **HUGHES-DILLON** was removed from the entry way, he advised TFO Joe Somogye there was a firearm belonging to McConnell inside the residence. **HUGHES-DILLON** further advised TFO Somogye that nothing in the residence belonged to him, even stating he did not have a cellphone in the residence.

18

35.      I spoke to McConnell who advised that **HUGHES-DILLON** lives at the residence with her and her two juvenile children. In SA Joseph Galloro's and my presence, McConnell signed a consent to search the residence. McConnell informed me that when the USMS began to knock and announce, **HUGHES-DILLON** was in their shared bedroom manipulating his cellphone. A search of the residence revealed the **subject electronic device** underneath the bed in **HUGHES-DILLON** and McConnell's shared bedroom. Based on **HUGHES-DILLON's** behavior, McConnell's statements, locating the subject electronic device, and the investigation as whole, I believe **HUGHES-DILLON** was attempting to deceive law enforcement officers due to the incriminating evidence of the subject offenses that would be located on the **subject electronic device.**

**F.      My Training and Experience about the Use of Electronic Devices**

36.      During my career as a law enforcement officer, I have conducted numerous drug investigations including those of drug trafficking organizations. Based on my training and experience in such investigations, including electronic surveillance investigations, I and other members of the investigative team, know that drug traffickers communicate with each other utilizing cellular telephones and other electronic devices to facilitate the overall scheme of their illicit endeavors. In order to be successful, drug traffickers must communicate via telephones or other electronic devices to orchestrate the importation of controlled substances; to manage and maintain contact with drug couriers; to maintain contact with lower-level distributors in their day-to-day operations; to maintain contact with safe house operators where narcotics are stored; and to coordinate the return movement of the drug derived profits back to the sources of supply.

37.     Further based on my experience and training, I am cognizant that drug traffickers oftentimes "dump" or exchange their telephones and electronic devices for new telephonic instruments. Further insulating themselves from law enforcement detection, drug traffickers are known to subscribe to telephone and wireless communications and data services in other persons names and to frequently change their telephone number and or ESN's/IMSl numbers.

38.     I also know from prior investigations and subsequent de-briefing of involved parties by investigative team members, that drug traffickers are known to compartmentalize the use of multiple electronic devices.  As an example, a subject will use a certain electronic device to contact sources of supply, another electronic device to contact couriers, and other electronic devices to contact underlings, so forth and so on. Based on my training and experience and that of the investigative team, I know these measures are employed to thwart law enforcement's ability to detect members of a drug trafficking organization and conduct electronic surveillance on co-conspirators.

39.     I also know based on my training and experience that individuals involved in the trafficking of narcotics use devices such as the **subject electronic device** to facilitate their overall schemes and their illicit endeavors. In order to make it easier for drug currency and narcotics traffickers to communicate with one another, their phones and other devices often contain stored telephone numbers, programmed names, addresses, and encrypted codes and names. I also know that the phones and other communication devices of currency and narcotics traffickers often contain voicemails, text messages, photographs and emails relating to communications with co-conspirators, meeting locations as well as the telephone numbers of co-conspirators who have called or been called by the device.

40.    Individuals engaged in the activities described in this affidavit use electronic devices and mobile phones like the **subject electronic device** for a variety of reasons including:

a. accessing mapping and location services to assist in planning and facilitating their crimes, and to plan for their escape from crime scenes. Location data can indicate the user's patterns of behavior such as their physical location at the time the incidents occurred, and immediately prior to or after such incidents. It may also provide data related to the location of confederates residences, safe houses or other places used to perpetrate the crimes.

b. accessing contact lists of associates, confederates, and third parties;

c. Targets take pictures and videos of themselves and associates, to memorialize their activities and fruits of their illicit activities such as contraband, firearms, and illegally obtained currency. They use the images or to brag to other confederates. These individuals frequently maintain these photographs on their electronic devices and, as described below, often post the images on social media. With respect to firearms, I know that individuals engaged in the sale and trafficking of narcotics often carry firearms to protect themselves, their illicit product, and U.S. currency from theft, and based on my training and experience I know that they often keep photographs of firearms used in furtherance of their drug trafficking activities stored on cellular phones;

d. criminals use the devices for online social media platforms such as Facebook, Twitter, Snapchat, etc. They communicate with their associates and confederates

21

over such platforms. They post and display images and videos of contraband, fruits of their crimes, wealth, and otherwise memorialize criminal activities.

41.     In summary, electronic devices such as the **subject electronic device** described herein and the services they provide are such a pervasive and insistent part of daily life that carrying one is indispensable to participation in modern society. Thus, there is reason to believe that **HUGHES-DILLON** had, and used, the **subject electronic device** in conjunction with the events described herein. The **subject electronic device** itself operates as instrumentalities of the crimes described herein.

### G.     What Can Be Recovered from an Electronic Device

42.     Based on my training and experience, I know that forensic examinations may be performed on electronic devices such as mobile phones tablets and, computers. Devices use internal fixed memory, SIM cards, or removable memory that stores the previously described information. It takes specialized training and experience along with software and hardware to perform forensic examinations and analysis of such devices and memory to retrieve this information. A forensic examiner may be able to recover evidence of the illegal activities described in this affidavit, including: user attribution, photographs, text messages, videos, phone and address books, call history, and geographical location data.

43.     Based on my knowledge, training, and experience, I know that electronic devices such as those identified in this affidavit can store information for long periods of time. I know that these devices contain files or remnants of files that can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files

22

have been deleted, they can be recovered months or years later using forensic tools. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device

44.    Information that is electronically stored on the **subject electronic device** serves as direct evidence of the crimes described in this warrant. Forensic analysis may demonstrate how the respective **subject electronic device** was used, the purpose of its use, who used it, and when. There is probable cause to believe that such evidence will be on the **subject electronic device**. Data on the **subject electronic device** will likely also show who used or controlled that device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  Lastly, data on the **subject electronic device** can show how the **subject electronic device** was used as an instrumentality of the subject offenses.

45.    The **subject electronic device** has remained in the lawful possession of law enforcement investigators, since their seizure as described above. Therefore, while investigators might already have all necessary authority to examine the **subject electronic device**, I seek this additional warrant out of an abundance of caution to be certain that an examination of **subject electronic device** will comply with the Fourth Amendment and other applicable laws.

46.    In my training and experience, I know that **subject electronic device** has been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the **subject electronic device** first came into the possession of law enforcement.

23

**H.     Electronic Storage and Forensic Analysis**

47.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

48.     *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the **subject electronic device** because:

    a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b.  Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

    d.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process.

24

Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f.  *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **subject electronic device** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the **subject electronic device** to human inspection in order to determine whether it is evidence described by the warrant.

## CONCLUSION

49.    I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the **subject electronic device** described in Attachment A to seek the items described in Attachment B.

50.    Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion

25

onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

51.     It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant. I believe that sealing this document is necessary because the warrant is relevant to an ongoing investigation into the criminal organizations as not all of the targets of this investigation will be searched at this time. Based upon my training and experience, I have learned that, online criminals actively search for criminal affidavits and search warrants via the internet and disseminate them to other online criminals as they deem appropriate, *i.e.*, post them publicly online through the carding forums. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

**I state under the penalty of perjury that the foregoing is true and correct.**

Respectfully submitted,

Jaclyn Casaceli
Special Agent
Drug Enforcement Administration

**Sworn to, attested to, and affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedure 4.1 and 41 on January 14, 2026.**

RODNEY H. HOLMES
UNITED STATES MAGISTRATE JUDGE

26

## ATTACHMENT A

**subject electronic device:** A Blue Apple iPhone with no case; Model # Unknown; FCC ID: Unknown; IC: Unknown; IMEI: Unknown:



The **subject electronic device** is stored securely in the St. Louis Gateway Strike Force electronic evidence lockers located within the city of Maryland Heights, in the Eastern District of Missouri. It has not been examined or altered in any way since its seizure.

This warrant authorizes the forensic examination of the **subject electronic device** for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT B

1.     All records on the **subject electronic device** described in Attachment A that relate to violations of Title 18, United States Code, Section 1956 and Title 21, United States Code, Sections 841(a) and 846 (the "subject offenses") involving Christile HUGHES-DILLON, including: dialed-call telephone numbers; received-call telephone numbers; missed-call telephone numbers; names, telephone numbers, addresses and other data located in the address books or contacts databases; photographs; voicemails; emails and text messages stored, and/or removable SIM cards, and/or removable data cards, and data stored, audio/video files;

2.     Evidence of user attribution showing who used or owned the **subject electronic device** to be searched at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3.     Records evidencing the use of the Internet to communicate via email, social media websites, or other electronic means, including:

     a.  records of Internet Protocol addressed used;

     b.  records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

4.     As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form;

5.     All data files, including but not limited to, records and graphic representations, that is, documents and visual depictions of accounting records, websites, marketing, and facilitating records pertaining to the subject offenses;

6.     Graphic interchange formats and/or photographs, and other visual depictions of such Graphic Interchange formats (including, but not limited to, JPG, GIF, TIF, AVI and MPEG) containing matter pertaining to the subject offenses;

7.     Electronic mail, chat logs, Internet Relay Chat (IRC) log files and electronic messages pertaining to the subject offenses;

8.     Log files and other records concerning dates and times of connection to the Internet and to websites pertaining to the subject offenses; and

9.     Any Instant Message conversations, chats, e-mails, text messages, or letters pertaining to the subject offenses.